The next case for argument is United States v. Moya, docket 20-2006. And ready for you, counsel, when you're ready to present. Thank you, Your Honor. May I please the court, counsel? The issue I'd like to talk about today is the District Court erred in denying Mr. Moya's motion for judgment of acquittal as account two of the indictment. No admissible evidence supported the government's allegation that heroin that my client sold to Dyson resulted in the death of Weiss. Scientific evidence established that the heroin supplied by Moya could not have been the heroin that killed Weiss. There was insufficient evidence to prove that the heroin sold by Dyson killed Weiss. I ask you to pause there. You're essentially asking us to substitute ourselves for the jury and believe you're expert rather than the government's, aren't you? Well, I really think when you look at the totality of the evidence presented and how weak it is, this case shouldn't have gone to the jury. The judgment of acquittal should have been entered. There are just a lot of evidentiary problems with this case. For example, Weiss died nine hours after his last heroin use. That alone calls into question whether or not the government met their bet for causation element. There was trial evidence that Weiss used a combination of drugs in the hours before his death, not just heroin. He used other drugs. The investigators failed to draw Weiss's blood or urine timely and failed to request additional toxicology tests for other possible causes of death, such as other drugs found in his system. Weiss's mother found a syringe with cocaine residue in Weiss's bedroom, but she did not provide that evidence to the DEA until a year after Weiss's death. Moya's toxicology expert testified that it was scientifically impossible that Weiss was killed by that heroin, or that it was scientifically impossible that Weiss was killed by heroin. The government failed to provide evidence that other causes of death were investigated and determined not to be the cause of Weiss's death. So there are serious problems here with the government meeting the bet for causation element of 841 B1C. The government did not prove that the heroin sold by Moya to Dyson was a source of heroin that caused Weiss's death. And the other drugs, such as cocaine, were not contributing factors. What was the what was the evidence contrary to the evidence that your client provided the heroin that he that he took? I mean, what's the evidence that somebody else provided that heroin? Well, there were there was evidence that there was evidence that he was a heroin user. So we don't know whether or not he used other other heroin. But there was also cocaine. There was evidence that he would use cocaine that night as well. Right. I just I just want to back up to the idea that that somebody got the heroin somebody from somewhere else. We know the government put on evidence that he received heroin from your client. So what's the evidence other than he was a habitual user that he got it also from another dealer? I don't recall any direct evidence that he got heroin from another dealer. But we do know that that he was a heroin user and there's no evidence that the heroin the evidence is when you look at it, that the evidence that the heroin that my guy gave to somebody else that supposedly gave it to him, the evidence is that he didn't use that within nine hours of his death. Right. I mean, the jury found apparently that he did. I mean, don't we have to take the facts in the light most favorable to the jury verdict? Yes, you do, your honor. But but I submit to the court that this case was so weak that it I don't think it should have gone to a jury. It's bad. I mean, you made a motion for a directed verdict before before it went to the jury at all. There was there was a motion that was filed, but there was a motion to dismiss that kind of the indictment. And there was also a motion for acquittal that was submitted right after the close of the government's case. Did you make a 50 B then after that or not? I believe so. I was not the trial counsel, but multiple motions were made. There was a motion for judgment of acquittal to dismiss count to it at the close of the government's evidence. I can't. Was there another motion at the end of the case when the case was submitted to the jury at the time the jury got it? I don't recall that offhand. But there probably was. There were a couple of cases that we cite that the Krieger case and the Burrage case, we believe the government did not meet its burden of proof similar to the prosecution in Krieger. And it and it and it failed to establish the narrowed requirements that the Burrage case, the Supreme Court case requires. The government was required to prove that in the absence of our client's conduct, that the decedent would have died, would not that he would have would not have died. And I submit to the court that when you review this record as a whole, they just can't get there. It's really weak. The are you saying that the heroin usage didn't even matter? Well, I submit the court that they have to show that that the heroin usage usage was somewhat at least contemporaneous with the time of death. Well, it all it says is that the heroin could be in combination with other drugs. It just has to be that. And using the court's language, the heroin was the straw that broke the camel's back. And that's what the testimony was. I submit the court, I don't believe that that's consistent with the testimony and the facts in that there is really no evidence that he used heroin within nine hours of his death. And usually heroin is a fast acting drug that kills fairly immediately, usually within an hour of the use of the latest. So heroin is something that typically kills immediately or within the hour. And there's no evidence here that he used heroin within nine hours of his death. I submit to the court that when you look at the facts of this case and the evidence that this decedent had to have died something other from something else besides the heroin that our client sold to somebody else that apparently made its way down to him. But do you agree that the government's expert Andrews said that heroin did cause it? I agree. Well, she did for my remember, she didn't she she didn't say it definitely caused it. She said it probably did. She said that it most likely did or probably did, but not definitively. I thought she said that absent the heroin, he wouldn't have died. And that's the test, right? I think they had to they had to prove that that was the cause of death. Yes. She testified that. But I would submit to the court that really, when you look at the at this record, it doesn't support a conviction for count to the court, please. I'd like to reserve the remainder of my time and co-counsel will use it for rebuttal. Very well. Thank you. Mr. Braun, you're ready. Good morning, your honors, counsel, may it please the court. My name is James Braun and I'm an assistant United States attorney in Albuquerque. The defendant raises numerous issues, most of which were not preserved, either because he didn't lodge a sufficient objection below or because he failed to sufficiently brief them on appeal. I'd like to focus this morning on one of the issues that he did preserve, the issue that we were the court was just talking about and that the defendant focused on solely in his reply brief, and that is the sufficiency of the evidence on count to the count charging distribution resulting in death. The defendant argues that the government failed to prove that Cameron Weiss's death resulted from his use of heroin that the defendant sold to Dyson on August 12th, 2011. But this argument flies in the face of the substantial evidence presented at trial. The Cameron use only heroin obtained from the defendant in the hours before his death and that he would not have died but for his use of that heroin. And to address Judge Phillips last question about Dr. LeBay's testimony in that regard, she did testify that heroin alone killed Cameron Weiss, and that's in the record at page 1253. Now, first, as far as the whether the heroin that Cameron Weiss used came from the defendant, there was substantial evidence of that. Cody Rondo testified about how he and Cameron met up with Joe Dyson and they drove to buy the heroin. Joe Dyson testified that he bought the heroin from Raymond Moya. That wasn't really contested. But Rondo also specifically testified that that was the only heroin that they used that night. The heroin that came from Joe Dyson that Dyson obtained from Raymond Moya and Cody Teeter testified that he had used drugs before with Cameron Weiss and that they never saved drugs for later. So it's not as if Cameron would have had another stash of heroin somewhere. Now, as far as the second question, there was substantial evidence that heroin was the but for cause of Cameron's death, as Dr. Andrews testified it was, and as consistent with Dr. LeBay's testimony, that heroin alone killed Cameron. The jurors could have relied and properly did rely on that same evidence in reaching that conclusion. The observations of those who were with Cameron in the hours before he died were consistent with a heroin overdose. Antonio Martinez testified that Cameron was nodding out with his head down and that he looked almost dead. Cody Rondo testified that this same heroin caused him to fall out or lose consciousness, and Dr. Pike even admitted that Cameron's tolerance for heroin would have been lower because of his recent time spent in jail. And of course, we know that he had also spent the previous week in California with his family exhibiting signs of withdrawal. And Dr. Andrews observations during the autopsy, the swollen brain from lack of oxygen, the pneumonia were all consistent with the heroin overdose where heart rate, breathing rate and blood pressure decrease and the person's ability to protect their airway is compromised. Now, compare that to an autopsy for a cocaine overdose where Dr. Andrews testified, there's just not much to see because it's a very different type of death where your heart is racing as opposed to the blood pressure decreasing in a cocaine overdose. Now, the defendant focuses on the timeline and argues that there were nine hours between the last use of heroin and the time of Cameron's death. But that's not quite accurate because even taking the defendant's argument at trial that Cameron's last use of heroin was at 11 p.m. We know that he's already dead by the time his mom checked on him at 730 in the morning and that was an hour before the official pronouncement of death came. But even that timeline is not set in stone because it's based mostly on the combined recollection of Cody Rondo, who was using heroin that night, and Antonio Martinez, who was using marijuana about events that had occurred nearly eight years before. Cody Rondo testified that he and Cameron went to Antonio Martinez's house after using Whole Foods parking lot. They stayed there for around 20 minutes and that he then took Cameron home. Now, Cody Rondo couldn't remember the time that this all happened, but we know from Curtis Weiss, Cameron's dad, he heard Cameron come in at around three or three thirty in the morning. And while Martinez testified that Cody Rondo and Cameron came over at around midnight, he also testified that he went to bed at around three a.m. And then it wasn't that long after Cameron came over. So the jury heard evidence that the timeline from Cameron's last use of heroin in the Whole Foods parking lot to him going to Martinez's house, going home and then passing away was likely much shorter than nine hours. Well, so we've got we've got possibly taking evidence most favorable to the government. We have that he came home at three thirty, taking evidence most favorable to the government. We have the father saying he heard moaning at some period of time in there. I don't know what that time moment was. And then we have the mother finding him dead at seven thirty. When did the father hear the moaning? Sometime between five and five thirty in the morning, he had to go to work very early that morning. So if that were five and taking the evidence most favorable to the government. We have about it, we have about one and a half hours. With all the evidence and inferences for the government, we have one and a half hours elapsed after the heroin and he was still alive. The last he could have the last he could have taken the heroin was before three thirty when he got home and the first and the last time that he was heard alive was moaning at five o'clock. So he could have died at five or one if you're being most favorable to the government. So we have about a we have about an hour and a half. Maximum for the government, if for the favor of the government, is that right, that from the taking of the heroin to the death? Not quite, because Cody Rondo testified that the last time they used heroin was in the Whole Foods parking lot. And we know that that was before they went to Martinez's house. And when was that? When was that? So that's the question. We don't we don't precisely know. But if you back out the testimony where Cody Rondo testified, they were at Martinez's house for about 20 minutes. Martinez testified. On one hand, he testified that they got there around midnight, but on the other hand, he testified that he went to bed at three in the morning and that wasn't that long after Cameron came over. It's entirely possible that Cameron and Cody Rondo used heroin in the Whole Foods parking lot at two thirty in the morning, went to Martinez's house for 20 minutes and then went home between three and three thirty. And so we're still talking about a pretty short window of time, two and a half or so hours between the last. Yeah, but we've got the we've got the defendants experts in that say that that is longer than than you would experience death. Right, that's what Dr. Pike testified to, but Dr. Andrews testified. I'm sorry. Go ahead. No. Did did Andrews say that heroin death and overdose could be as long as two and a half hours? He didn't testify to any particular time, I don't believe. But what he testified is that in his practice, he would see some cases where a person died right away from a heroin overdose, essentially with the needle in their arm. But that the most common way was where an individual gets sleepy, they start to lose consciousness, they slip into a coma and then they die a slow progression. Those are his words at page 10. Twenty three of the record. But that's consistent with Cameron's death. Did he put any time limits on that slow progression? Not to my memory. But longer than an hour is what Dr. LeBay testified to. She testified that she specifically disagreed with Dr. Pike and said that someone can overdose from heroin more than an hour after their last use. And the reason she gave was heroin metabolizes into, I think, 6 a.m., which then metabolizes into morphine in the body. Morphine can stay pharmacologically active in the body for several hours. And so if it's pharmacologically active, depressing someone's breathing, suppressing their ability to clear their airway for several hours, that's entirely consistent with how Cameron died. Well, my question is that our review here is beyond reasonable doubt. Is there evidence taken most favorable to the government that beyond any reasonable doubt the jury could have convicted? So, yes, we have to give all reasonable inferences to the government, but we have to but we are bound by the evidence in the record. And it looks to me like taking all inferences for the government, we have two and a half hours gap. So then I have to ask myself, is there any evidence in the record that a two and a half hour gap could have been caused, could be appropriate or could be wouldn't be impossible for that death gap between the time of taking the hair and the time of dying? And it's that point that I just don't see any evidence on. If there is no evidence, then even though we give all inferences to the government, I am troubled. Well, and there is evidence, Your Honor, and that's where Dr. LeBay comes in, because she specifically testified that it is possible for someone to die from a heroin overdose more than an hour after their last use. And that's where. But that is more than more than an hour. Right. And she further testified that we got to get up to two and a half hours, taking everything most favorable to the government. Right. I'm just not sure that I see any evidence by the government to that effect. She specifically testified that when heroin metabolizes ultimately into morphine, the morphine will stay pharmacologically active in the body for several hours. But can you be more precise? What I'm recollecting is she spoke about half lives and that she said that the pharmacological effect was 15 hours. But I may be wrong on that. That's just what I'm remembering. Is that accurate? And did she then tie that 15 hours to a potential cause of death? Or is there a certain amount of time after during that whole process where you have escaped that danger, even though it's still active in your body? I'm not sure that that's clear from her testimony, Your Honor, but the fact that the morphine can stay pharmacologically active in the body for several hours, that is something she testified to. And to the extent that we know morphine has a depressant effect. And all of the other evidence is consistent with Cameron Weiss dying from a from that depressant effect for the aspiration to the pulmonary edema, to the observations of everyone who was with him that evening. It's all consistent with death from heroin use, from heroin overdose. You know, my my hang up is that we have to we have to somehow decide whether there is any evidence and all inferences that could support a juror saying, yep, there's no doubt in my mind, there's no doubt, no reasonable doubt in my mind that he died from that heroin that was given to him by Moya. Right. And Dr. Andrews testifying that but for the heroin use, Cameron Weiss wouldn't have died, and Dr. LeBay testifying that the heroin is what killed him, that was sufficient for the jury to rely on and really this came down. They're testifying that heroin killed him. I don't I think that's probably clearly established on the record that the issue is what heroin, where where did it come from? Now, there is evidence that he didn't stash any of his own, but that's but but the negative isn't what the government has to prove. The government has to prove a positive that it came from Moya and it proved that positive, Your Honor. I would I would say through Cody Rondo's testimony that the heroin that came from Joe Dyson that Joe Dyson testified came from Raymond Moya was the only heroin they used that evening. And Cody Rondo. Let me ask it this way, could the jury on this evidence have concluded that that Cameron kept some of the heroin that they bought from Moya that night and used it when he got back to his house? There was nothing to negate that, that inference. Is that enough to show beyond reasonable doubt? Can the government say I urge you, the jury, to convict because there is nothing that nothing to negate my arguments that that would be a really crappy closing argument by the government? It would be. And that wasn't our closing argument here. Your Honor, our argument was in the affirmative that Cody Rondo testified. They obtained that heroin. It was the only heroin they used that night and that he was with Cody was with Cameron all night from the time they obtained and used that heroin through being at Antonio Martinez's house until Cody himself took Cameron home, dropped him off. And then Curtis Weiss heard Cameron come into the house. And so that evidence was sufficient to show that the heroin that came from Raymond Moya is the only heroin that Cameron used and that that's what killed Cameron Weiss. But there is a gap there. There is a time gap from the time that he was dropped off at the house. By his friend and the time that the father heard him come in the garage, there's time for him to go get more heroin now, whether he has any money he's trading an amp for the day before, I think, and someone else had the money this time. And I don't think he had any any way to obtain that heroin. He didn't have a ride. I don't believe he even had a phone at that time because his mom had taken away his phone. So I don't think there's any basis for an inference that in the time between Cody dropping him off and him going into the house, he somehow obtained more heroin that he used. I don't think that's a reasonable inference on this record. Well, the only frankly, I expected I expected he got it, the heroin from Moya, but but I get concerned that we sometimes don't hold the government to its proof and. I or at least there's a we do, in fact, hold the government to its proof, but that there is arguments made to us as lawyers that we shouldn't hold the government to its proof. And I am I'm just troubled that there's a gap that the government really hasn't closed here. Your Honor, I think the the investigating agents in this case went to great lengths to prove the case so that we could present it to the jury and that we did present a case on which the jury could find beyond a reasonable doubt that Raymond Moya distributed the heroin that resulted in Cameron Weiss's death. The agents interviewed Cody Rondo about his time with Cameron Weiss that night. They found Joseph Dyson. They interviewed him. We put him on the stand to testify about him obtaining the heroin from Raymond Moya. There was no other heroin that Cameron had access to that night. Now, what happened to Cody? I mean, what evidence is there that he didn't have other heroin either stashed in his house or that he took some of the some of the Moya heroin and kept it in his pocket until he got home? My recollection of Cody Rondo's testimony is that they use all the heroin that night. And Mr. Teeter testified he's the one that used drugs with Cameron the night before that Thursday night, August 11th. He specifically testified they didn't save drugs for later. They were users. They used what they had. And I think that's consistent with the idea that Cameron didn't have a whole lot of family's and to to get heroin the week before. So they used what they had. And that's what Cody testified to. And that would be the heroin from Raymond Moya on August 12th into the early morning of August 13th. And unless the court has any other questions, I see I'm out of time and we would just ask that the court affirm the defendant's conviction as to count to. Thank you. Thank you. Counselor, you're in luck. Your opponent went over three and a half minutes. So if you do the same, I won't squawk. Thank you. Can we go to you for Raymond Moya? First, I'd like to Mr. Braun just stated this fact, but I'd like to reemphasize that Rondo testified that him and Weiss used up all of the heroin allegedly distributed from Moya that night. And so that was used up if we're going with what he testified with, which was at around 11 p.m. So he testified not only that he used all of his share, but he testified that that Weiss used all of his as well. Is that right? Yes, your honor. He testified that they used all of the heroin, the point two grams they they from Dyson that Dyson got from Moya, that they used that all up. And so that that source of heroin was used up a significant amount of time before. But he said that we used it up that night. Did he mean during the initial shooting up or did that night include the time at the Whole Foods parking lot? I believe it included the time at the Whole Foods parking lot, your honor. OK. And so. This what about the remaining that that was just a fraction of the amount that was purchased for one hundred dollars that went to the victim here and or the young man and his friend. But there was still a remainder of the majority of it was in Dyson's hands, wasn't it? It was. What about that? Did anybody say that? That got used up. Dyson left Rondo or Rondo and Weiss after after. So he purchased one point eight grams of heroin from Moya for himself and he purchased point two grams for Rondo and Weiss. They used some of the heroin from Rondo's one point eight grams. And then Dyson left with his his stash of the heroin. And later, Rondo and Weiss used their point two grams of heroin later. What do you mean? I believe that was at the the Whole Foods parking lot where he testified that was approximately before they went to Martinez's house. Wasn't the purchase at eleven o'clock. Do I have that wrong? I believe that's so the point to the point to is used. At least a period of time after that, because they were using the point with the one point eight soon after eleven, and then it sounds like there was a separate event where they use their own. Yes, he testified that they they use their point to after Dyson had left them and before they went to Martinez's house. And this would be before Weiss returned home. And so there is this gap in time that remains. And even though Dr. Lopez concluded that heroin was the cause of Weiss's death, she neither she nor Dr. Andrews, the government's experts, could conclude that that was the same heroin that Moya distributed. And neither Dr. Andrews nor Dr. Lowe could state how much time beyond an hour death could still result from this use of heroin. And so there's this gap. Did anybody put some outside perimeters on parameters on that? You can't say how long after an hour, but can any of you say how long is too long? I mean, a week would be too long. A day would be too long. 12 hours. How did anybody in the government ever seek to put an outside possible parameter on that? Or did they just hope to slip that through without being challenged very much? And they were successful in that. I believe the record reflects that the government did not put any parameters on that. They allowed Dr. Andrews and Dr. Lowe to say that that death could possibly occur outside of an hour, but there was no parameters on that. So they neither of them testified that death could occur whether we're going with two and a half hours or with the last time that Rondo testified they used heroin, which was before midnight. So seven approximately seven hours prior where you don't get to have the seven hour period. You have to live with the with the evidence in a light most favorable to the government, right? Yes, your honor. But Rondo did testify. Mr. Braun said that there could be less time. He said there could be. But when Mr. Rondo testified, too, is that they used heroin for the loss of his heroin before going to Mr. Martinez's house. And that was before midnight. That is what the testimony said. Mr. Braun made the conjecture that Martinez said he went to bed before three and that Rondo returned to his house around three. And he's saying that they could have been at his house before around two or three. But that is not what the testimony says. I mean, from all the different testimony, though, you could infer that. I mean, there's lots of testimony that fits to everybody's timeline seems different in this case as far as the witnesses and, you know, giving giving everybody some latitude based on the fact that they all appeared to be using drugs that night. It could have been later than the 1030. It could have been, your honor, but, you know, it's still we run into the same problem that he died more than an hour after possibly two and a half hours. If we're going with what we were discussing with Mr. Braun, that he could have died. And neither of the government's experts could say that that could occur with that much gap in time, nor and then our experts said that that is scientifically and physiologically impossible to die beyond an hour from taking heroin. Now, that's Dr. Pike, right? Yes, your honor. OK, now, did did he walk that back a little bit? I mean, because wasn't there some testimony in the record about how even in his ER practice when people came in who were overdosing on heroin, he would he would give them something to reverse it, but make them stay for a while just in case it didn't immediately take effect because he thought that there could be some situations where the effects lasted in excess of the hour. He did testify to that, but he said in this in this case, you know, when you're when he took the amount that Weiss took, which would have been less than point two grams because he split it with Rondo that he believed that it was just it was impossible for Weiss to have died past an hour of taking it. OK, was there some testimony about the strength of this heroin that was it was it Rondo who was passing out from it, from from the same amount fell out of the car or something? Yes, Rondo did pass out. There wasn't necessarily a testimony as to the strength. It was as to Rondo and Weiss's tolerance at the time. In that Weiss had been in detox during his time in jail, but he had also been doing drugs the night prior, so his tolerance varied. And so I see my time is up and Judge Phillips gave me a little bit of leeway, I would I The court reversed the judgment convicting Mr. Moya under Section 21 or 21 USC Section 841 E1C. And let me just make sure no additional questions from the panel. No. All right. Thank you for your arguments. The case is submitted.